UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 8/26/08
```

TEOFILO REYES,

: 07 Civ. 1044 (PKC)(THK)

                    Petitioner,         :

                                        :

        -against-                       :

                                        :        **REPORT AND**

                                        :        **RECOMMENDATION**

SUPERINTENDENT R.J.,                    :

CUNNINGHAM,                             :        (PRO SE)

                                        :

                    Respondent.         :
------------------------------------X

**TO: HON. P. KEVIN CASTEL, United States District Judge.**
**FROM: THEODORE H. KATZ, United States Magistrate Judge.**

Teofilo Reyes ("Petitioner") was convicted on November 27,
2002, of one count of Burglary in the Second Degree (New York Penal
Law § 140.25(2)), following a jury trial in New York State Supreme
Court, New York County, and was sentenced as a second violent
felony offender to a determinate term of nine years' imprisonment.
The Appellate Division, First Department, affirmed Petitioner's
conviction on October 14, 2004. Leave to appeal to the New York
Court of Appeals was denied. See People v. Reyes, 11 A.D.3d 293,
782 N.Y.S.2d 457 (1st Dep't), lv. denied, 3 N.Y.3d 760, 788
N.Y.S.2d 676 (2004).

Petitioner, now incarcerated at the Woodbourne Correctional
Facility, seeks habeas corpus relief, pursuant to 28 U.S.C. § 2254,
raising two claims. First, Petitioner contends he was denied
effective assistance of counsel on three grounds: 1) counsel failed
to object when the prosecutor introduced testimony of an eyewitness

regarding a prior lineup identification of Petitioner; 2) counsel failed to object to the prosecution's application to withdraw a notice of intent to offer evidence of a statement that Petitioner made in connection with his August 28, 2001 arrest; and 3) counsel failed to inquire as to why a photograph was taken of Petitioner before the September 6, 2001 lineup. Second, Petitioner claims that the prosecutor's summation was prejudicial and denied him his due process right to a fair trial. (See Amended Petition for a Writ of Habeas Corpus, filed April 12, 2007 ("Am. Pet.").)

This proceeding was referred to this Court for a Report and Recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) (2008). For the reasons that follow, the Court recommends that the Petition be denied and the action be dismissed with prejudice.

## BACKGROUND

### The Crime

On the morning of August 13, 2001, Frank Powers ("Powers") locked the door to his apartment at 1707 Second Avenue, in Manhattan, and left for work. (See Trial Transcript, dated October 24, 2002 ("T."), at 177.) He returned to his apartment at about 4:30 p.m., to find his door ajar and many of his belongings missing, including his personal computer and other electronic appliances, as well as a large green duffle bag containing his scuba gear. (See id. at 177-78, 182-85.)

That same morning, at about 11:00 a.m., Emeric Csantos

2

("Csantos") and January Boscarino ("Boscarino") were talking and drinking coffee in Csantos's truck outside 1707 Second Avenue, when they saw a man hail a taxicab parked "about six feet, [or] eight feet" in front of the truck. (Id. at 225.) Csantos, a superintendent of a nearby building, and Boscarino, owner of the cheesecake store on the first floor of 1707 Second Avenue, then witnessed the man go into and out of the building several times, each time placing items in the trunk of the cab. (See id. at 224-26, 237-38.) In all, the man's trips in and out of the building took about ten minutes. (See id. at 231.) Among the items they witnessed the man load into the cab's trunk were an unwrapped, unpackaged computer and a green duffle bag. (See id. at 226, 243-44.)

The two witnesses recounted very similar descriptions of the man loading the taxi to the police and at trial. More specifically, Boscarino described the man as "[y]oungish" and "Hispanic" with "a bit of facial hair and . . . a hat" and "wearing like baggy long shorts and . . . a t-shirt." (Id. at 226, 232). Boscarino told the police that the man weighed approximately 145-150 pounds. (See id. at 214.) Csantos described the man as "a little bit chubby," about "five something [in height]" and "a Puerto Rican guy or a black." (Id. at 245-46.) Because of the proximity of the taxicab, and the bright, sunny weather that morning, both witnesses testified that they got a good look at the

3

man's face. (See id. at 238-39.)  Also, the witnesses testified
that the man attracted their attention when he placed a computer in
the trunk of the taxi without any type of protective wrapping or
covering. (See id. at 227, 238.)

When Powers returned home and noticed his missing belongings,
he immediately called the police and filed a report. (See id. at
178.)  Detective Thomas DiDomenico ("DiDomenico") was assigned to
the case that same day, August 13, and he commenced his
investigation by speaking to Powers, Csantos, and Boscarino. (See
id. at 199.)  During his discussions with DiDomenico, Powers did
not provide any viable leads concerning who may have robbed his
apartment, but he did state that he thought Jason Hili, the
"replacement" superintendent, might have a key to his apartment.[1]
(See id. at 188-89.)  Csantos and Boscarino also relayed their
descriptions of the suspect to the detective.  (See id. at 199-
201.)

## The Arrest and Charges

On the morning of August 28, 2001, Police Officer Frank
Caccamo ("Caccamo") was riding in a yellow taxicab used by the New
York Police Department's anticrime unit, traveling westbound on

---

[1] The regular superintendent was on vacation.  Powers had
never seen Hili at the time of this discussion.  Hili's
appearance deviated from the eyewitness descriptions of the
perpetrator in that he weighed 235 pounds.  (See id. at 211-12,
214-15.)

East 89th Street from Second Avenue.[2] (See id. at 157-58.) That morning, the anticrime unit was targeting the one, two, and three hundred blocks of East 89th Street, due to a recent pattern of burglaries. (See id. at 158; Hearing Transcript, dated October 21, 2002 ("H."), at 9.) Caccamo first observed Petitioner walking on East 89th Street at about 11:30 a.m. (See T. at 159.) Noticing suspicious behavior — including slow, deliberate walking, peering into entrances of buildings, and entering the vestibule of a building but only lingering — Caccamo and his unit decided to pay special attention to Petitioner. (See id. at 159-61.) Caccamo exited the police car to track Petitioner on foot, and after seeing Petitioner disappear into a building for a period of ten to fifteen minutes, Caccamo radioed for backup. (See id. at 160-61.)

When Petitioner exited the building, Caccamo identified himself as a police officer and asked Petitioner to answer a few questions. (See id. at 161.) In turn, Petitioner told Caccamo he had entered the building to do some carpentry work for a friend named Jose, yet he was unable to provide a last name or telephone number for Jose.[3] Furthermore, he incorrectly identified the

---

[2] The anticrime unit deploys plainclothes officers to detect street level crimes. (See Hearing Transcript, dated October 21, 2002 ("H."), at 7.)

[3] This statement is the basis of Petitioner's second ineffective assistance of counsel claim, in which he asserts that counsel failed to object to the prosecution's withdrawal of its intent to offer the statement in evidence.

5

street he was on, responding East 88th when he was actually on East 89th Street, and could not state the address of the building "he just came out of." (See id. at 161-62.) Next, with permission, Caccamo frisked Petitioner and searched the bag in his hand, recovering a metal pick from Petitioner's pocket, and tools, gloves, a computer mouse, and a Kenneth Cole watch from the bag. (See H. at 13, 14.) After Petitioner failed to identify or correctly describe the watch or tools in his bag, Caccamo handcuffed Petitioner. (See H. at 15; T. at 162.)

Subsequently, on that same day, Petitioner was arrested and charged with burglary in the second degree, with regard to the building he was seen exiting.[4] (See H. at 15.) On September 6, 2001, Detective DiDomenico, during the course of his investigation of the August 13th burglary, organized a lineup in which Petitioner participated. (See T. at 199.) Petitioner alleges that, before the lineup was conducted, a photograph was taken of him.[5] (See Exhibit ("Ex.") G annexed to the Declaration of Thomas B. Litsky, dated August 10, 2007 ("Litsky Decl.").) DiDomenico also took a photograph of the lineup itself. (See T. at 201.) In contrast to his appearance on August 13, when he sported facial hair and a hat,

_____

[4] The burglary of that building, of which petitioner was eventually found not guilty, is not the subject of this proceeding.

[5] Defense counsel's failure to inquire as to why a photograph was allegedly taken is the basis for the third ground of Petitioner's ineffective assistance of counsel claim.

6

at the lineup Petitioner appeared clean-shaven and without hair on his head. (See id. at 201-02.) Csantos and Boscarino viewed the lineup separately, and, despite Petitioner's change in appearance, both immediately identified Petitioner as the man they had witnessed on August 13. (See id. at 229-30, 240.) After the lineup identifications, Petitioner was charged with one count of second degree burglary in connection with the August 13th burglary. Shortly thereafter, Petitioner allegedly told DiDomenico that he had a "$500 a day [drug] habit" and he wanted to be admitted to a drug program. (See Litsky Decl., Ex. O at 2; see also T. at 202; H. at 63.)[6] Petitioner was also charged with one count of second degree burglary of a third building, located at 168 East 89th Street. In all, Petitioner was charged with three counts of second degree burglary.

## The Trial

After reviewing the grand jury minutes, the trial court dismissed the second degree burglary count related to 168 East 89th Street, on February 22, 2002.

On October 21, 2002, at the pre-trial suppression hearing, defense counsel, resting on the hearing record, unsuccessfully sought suppression of the lineup identifications and Petitioner's statement directly after the lineup, in which Petitioner asked

---

[6] Unless otherwise noted, all cited exhibits are annexed to the Litsky Declaration.

DiDomenico to recommend to the prosecutor handling the case that he be placed in a drug rehabilitation program. (See Litsky Decl., Ex. A at 4.)

Defense counsel also made a motion to suppress evidence, which was partially successful. (See Suppression Hearing Transcript, dated October 22, 2002 ("S."), at 103-09.) First, in a motion in limine, Petitioner's counsel requested that the prosecution be precluded from introducing testimony regarding the recent history and trend of burglaries in the neighborhood of Petitioner's arrest. (See S. at 116-18.) Only limited testimony on the subject was allowed. (See id.) Second, also in a motion in limine, Petitioner's counsel argued that a portion of the statement allegedly made by Petitioner to DiDomenico, regarding drug rehabilitation, should be suppressed because it had not been included in the disclosure statement provided by the prosecution (See T. at 121-26.) This motion was denied.

The trial began on October 24, 2002, before Justice Michael Obus and a jury.

## Prosecution's Case

The prosecution's case revolved around the eyewitness identifications of Petitioner, both at the scene of the burglary and at the September 6, 2001 lineup. In addition, the prosecution stressed the theme of Petitioner's evolving appearance, arguing that it provided a basis from which the jury could infer a

8

consciousness of guilt. The prosecution called five witnesses: Powers, Caccamo, DiDomenico, Boscarino, and Csantos. The two police witnesses, Officer Caccamo and Detective DiDomenico, testified primarily about Petitioner's arrest and the lineup. The eyewitnesses, Boscarino and Csantos, testified mainly about the events of August 13th and the lineup identifications.

Powers testified that he resided at 1707 Second Avenue in Manhattan, and that he had been burglarized on August 13, 2001, while he was at work. (See T. at 177-78.) Powers testified that his computer and monitor, assorted electronic paraphernalia, and a green duffle bag containing his scuba diving equipment had been taken. (See id. at 177-78, 185.)

Caccamo testified that he arrested Petitioner on August 28, 2001. (See id. at 156-62.) During Caccamo's direct examination, the prosecutor asked him about Petitioner's appearance at the time of arrest. In response, Caccamo testified that Petitioner "had a goatee . . . and his hair was very close cropped." (Id. at 162.) The prosecutor then introduced a photograph of Petitioner, from August 28, 2001, into evidence. (See id. at 162-63.)

DiDomenico testified that, in connection with his investigation of the August 13th burglary, he learned of Petitioner's arrest and arranged a lineup to be viewed by Csantos and Boscarino. (See T. at 199-201.) At the lineup, Petitioner selected position number five, and he was identified by both

9

Csantos and Boscarino. (See id. at 200-01, 229-30, 240.)
DiDomenico testified that, as he was fingerprinting Petitioner
after the lineup, Petitioner told him that he had a drug habit and
wanted to enter a rehabilitation program. (See id. at 202.) The
prosecution introduced a picture of the lineup into evidence, and
questioned DiDomenico about Petitioner's appearance as of
September 6, to which he replied: "In the photo of the lineup for
that day, [he] is clean shaven and he has no hair. Today
obviously he has hair on his head and a beard." (See T. at 201-
02.)

During her testimony, Boscarino recounted the events of
August 13, 2001, as described above. (See id. at 225-27.)
Moreover, Boscarino testified that she had a clear view of
Petitioner on the day of the crime, and that, at that time, he had
a bit of facial hair and was wearing a hat, which prevented her
from seeing whether there was hair on his head. (See id. at 226.)
During her testimony, Boscarino stated that she had seen
Petitioner holding the number five at the September 6, 2001
lineup, and she correctly identified Petitioner in the courtroom
when prompted by the prosecutor. (See id. at 228-30.) With
respect to Petitioner's appearance, Boscarino testified that it
had changed from the date of the offense, as Petitioner had "a
beard and mustache" at trial. (Id. at 230.)

Csantos offered similar testimony concerning the events of

10

August 13, 2001. Like Boscarino, Csantos testified that he correctly identified Petitioner at the lineup. Csantos asserted that his recollection of Petitioner was very fresh at the time of the lineup, and he described the procedure as follows: "they show me . . . five gentlemen over there and . . . . I recognize him immediately." (Id. at 239-40.) Furthermore, Csantos correctly testified that Petitioner was sitting at the far left of the lineup, holding the number five. (See id. at 241.) When asked whether he would be able to identify the man from the lineup if he saw him again, Csantos replied "Yes." (Id.) Unlike Boscarino, however, Csantos testified that he did not see the man he had identified at the lineup in the courtroom. (See id.)

During summation, the prosecutor stressed that Petitioner was correctly identified by the two eyewitnesses at the lineup, and that the eyewitnesses had no reservations about their identifications. (See id. at 272-78.) To explain Csantos's failure to identify Petitioner at trial, the prosecutor passed around photos of Petitioner's evolving appearance and argued that Petitioner intentionally altered his appearance "with the hope that" he could escape otherwise certain identification by the eyewitnesses. (Id. at 272-74.) Further trying to explain Csantos's inability to identify Petitioner at trial, the prosecutor argued that:

> The fact that . . . Csantos wasn't able to
> have as . . . indelible of a memory here after

11

> a year after the facts speaks more to his
> honesty and speaks more to the fact that he
> isn't just going to pick out anyone just
> because he thinks that's what's expected of
> him. He shows you that he would only identify
> someone when he was certain and he was certain
> on the 6th of September. He picked the
> Defendant.

(Id. at 280.)

## Petitioner's Case

Petitioner did not call any witnesses and did not testify himself. Defense counsel relied primarily on cross-examination of the prosecution's witnesses. Specifically, defense counsel focused on Csantos's inability to identify Petitioner at trial, and attacked this as a major flaw in the prosecution's case. Defense counsel also attempted to implicate the replacement superintendent as an equally possible culprit in the burglary of Powers' apartment.

From DiDomenico, defense counsel elicited that the replacement superintendent had been interviewed in connection with the crime and that Boscarino had originally suspected that the replacement superintendent was "involved in this." (Id. at 211-13.) During the testimony, however, DiDomenico volunteered that he did not think Boscarino "ever saw or knew who the replacement super was." (Id. at 214-15.) Instead, he testified that "I think she was aware that there was a replacement super working there and I think that was her suggestion." (Id. at 215.) While Boscarino had described the perpetrator as "hispanic" and weighing about

145-150 pounds, the replacement superintendent was white and weighed approximately 235 pounds. (See id. at 214-16.)

Defense counsel also challenged DiDomenico about his assertions regarding Petitioner's alleged statement concerning drug rehabilitation. (See id. at 205-11.) DiDomenico acknowledged that he had kept written reports of the witnesses in the case, that documented their comments. (See id.) He had also kept a written report of the lineup, but nowhere had he recorded Petitioner's request to be placed in a drug rehabilitation program. (See id.) DiDomenico did maintain, however, that he had advised the assistant district attorney of Petitioner's alleged statement. (See id. at 210-11.) Finally, defense counsel elicited testimony from DiDomenico that a police officer had recovered fingerprints from the scene of the burglary, but the prints "weren't of any value," meaning that they did not reveal any useful information. (Id. at 216-17.)

Powers was questioned about his integrity, and whether he would have staged the theft to collect insurance money. Powers testified that, on August 13, 2001, he "might" have voluntarily told DiDomenico that he "would not have staged this theft." (Id. at 186-87.) Powers testified that he filed an insurance claim for the stolen property, collected between $3000 and $6000 dollars for it, and that this was the second time he had been burglarized. (See id. at 187-88, 195-97.) However, Powers testified that the

other burglary was a theft of cash, and, thus, insurance recovery was not pursued. (See id. at 186-88.) When asked on redirect whether he "would . . . have preferred to have just kept [his] stuff," Powers answered "Yeah." (Id. at 193.) Powers also testified that, in actuality, his insurance payment did not cover the full value of his stolen possessions because of the inconvenience the burglary caused and the unrecoverable files that had been stored on his computer. (See id. at 193-94.)

During cross-examination of Csantos and Boscarino, defense counsel primarily questioned the accuracy of their identifications at the crime scene and the lineup. Csantos and Boscarino were steadfast in adhering to their prior descriptions of the perpetrator (see id. at 232-35, 243, 245-46), and Boscarino testified that she had never mentioned the replacement superintendent to DiDomenico (see id. at 233). Defense counsel tried to discredit Csantos's identification by asking several questions about the clarity with which Csantos observed the perpetrator, but Csantos maintained that he had a clear, unobstructed view. (See id. at 242-45.)

During summation, defense counsel advanced the argument that Csantos's inability to identify Petitioner at trial injected too much doubt into the prosecution's case to support a guilty verdict. Attempting to discredit the eyewitness identifications, defense counsel argued that "the fact that . . . Boscarino and .

14

. . [Csantos] chose [Petitioner] in a lineup, doesn't confirm that they were right about the identity of the perpetrator, in light of their testimony here." (Id. at 270.) Moreover, defense counsel argued that Csantos's inability to identify Petitioner at trial had nothing to do with Petitioner's evolving appearance, as Csantos could not remember whether the perpetrator had facial hair at any point. (See id. at 265-66.)

After both parties rested, defense counsel moved unsuccessfully for dismissal of the indictment. (See id. at 311-12.)

## Verdict and Sentencing

On October 28, 2002, Petitioner was found guilty of the second-degree burglary committed at 1707 Second Avenue, but was acquitted of the same offense at 219 East 89th Street. On November 27, 2002, Petitioner was sentenced as a second violent felony offender to a determinate term of nine years' imprisonment.

## Motion to Set Aside the Verdict

Before his sentencing, Petitioner filed a motion to set aside the verdict, pursuant to New York Criminal Procedure Law ("C.P.L.") § 330.30. Specifically, Petitioner alleged that the verdict should be set aside on the following five grounds: (1) he received ineffective assistance of counsel because counsel was unsuccessful in his efforts to suppress Petitioner's September 6, 2001 statement to the police concerning his drug habit and desire

15

to enter a rehabilitation program (see Litsky Decl., Ex. O at 2);

(2) a testifying witness failed to make an in-court identification of Petitioner; (3) the prosecution presented "bolstered testimony"; (4) there was "conflicting" testimony by the prosecution's witnesses; and (5) the jury was tainted by hearing the alleged statement Petitioner made to DiDomenico after his arrest, including Petitioner's request for a plea bargain, and these statements should not have been heard by the jury because the corresponding evidence was suppressed. (See Litsky Decl., Ex. N.) The motion was denied.

## Petitioner's Direct Appeal

Petitioner's appellate counsel, Abigail Everett, Esq., of the Center for Appellate Litigation, filed a brief in the Appellate Division, First Department, that raised two issues on Petitioner's behalf. First, Petitioner alleged ineffective assistance of counsel, arguing that his attorney should have objected to the introduction of Csantos's testimony about his prior lineup identification. (See Litsky Decl., Ex. A at 22-45.) Second, Petitioner challenged the prosecutor's summation argument — that Petitioner's evolving appearance revealed a consciousness of guilt — alleging that the argument deprived him of a fair trial. (See id. at 45-51.)

With regard to the ineffective assistance of counsel claim, the Appellate Division found that it "involved matters outside the

16

record relating to the reasons for trial counsel's failure to object to certain testimony," and thus Petitioner was required to bring a motion pursuant to New York Criminal Procedure Law ("C.P.L") § 440.10. (See Litsky Decl., Ex. C.) But, to the extent that the existing record permitted review, the Appellate Division found that counsel provided effective assistance. (See id.) Moreover, the Appellate Division found that an objection to Csantos's testimony about his prior lineup conviction would have been futile because, in any event, the prosecution would have established the admissibility of the testimony. (See id.) Finally, the Appellate Division found that Petitioner had failed to show the "absence of strategic or other legitimate explanations" for counsel's decisions. (Id.)

The Appellate Division declined to review Petitioner's summation challenge, finding it to be unpreserved. (See id.) The Appellate Division stated, however, that were it to review these claims, it would reject them. (See id.)

The Appellate Division unanimously affirmed Petitioner's conviction on October 14, 2004. See Reyes, 11 A.D. 3d at 293, 782 N.Y.S.2d at 457.

On October 22, 2004, Petitioner sought leave to appeal all of the issues raised on direct appeal to the New York Court of Appeals, but, on November 30, 2004, the Court of Appeals denied Petitioner's application for leave to appeal. See Reyes, 3 N.Y.

17

3d at 760, 788 N.Y.S.2d at 676.

Petitioner's Motion to Vacate the Judgment

On September 25, 2005, Petitioner filed a pro se motion to vacate the judgment, pursuant to C.P.L. § 440.10 ("440 motion"). (See Litsky Decl., Ex. G.)    Petitioner alleged ineffective assistance of counsel on six grounds: (1) counsel failed to object when the prosecution withdrew notice of its intent to introduce Petitioner's statement to the police; (2) counsel failed to inquire about the picture taken of Petitioner at the time of the lineup; (3) counsel failed to call the two eyewitnesses at the suppression hearing; (4) counsel failed to object to testimony about a prior identification, in violation of C.P.L. §§ 60.25 and 60.30; (5) counsel "opened the door"[7] to the prosecutor's consciousness of guilt argument by raising the issue of Petitioner's changing appearance; and (6) counsel failed to request a proper identification charge or to object to the court's charge. (Id.)    The motion was denied on all grounds without a hearing.   (See Litsky Decl., Ex. J.)

With respect to defense counsel's failure to object to the prosecutor's withdrawal of the notice of intent,[8] the court found

_____

[7] Defense counsel broached the subject of Petitioner's appearance during his summation.

[8] The court noted that Petitioner's claims were based almost entirely on the record before the Appellate Division, and that Petitioner had not supplemented the record in any meaningful way, such as adding an affirmation from trial counsel.   (See Litsky

18

that any objection would have been pointless because, in any event, the prosecution was not obligated to offer the evidence. (See id.) Moreover, Petitioner had been acquitted on the August 28, 2001 offense. (See id.)

In response to the claims that defense counsel failed to inquire about the photograph allegedly taken of Petitioner before the lineup, and that counsel failed to call the two eyewitnesses at the suppression hearing, the court found that there was no reason to believe that any viewing of a photograph of Petitioner took place before the lineup. (See id.) Furthermore, the court noted that both eyewitnesses had testified at trial, and their testimony, which was subjected to pointed cross-examination, made it clear that the lineup was valid and conducted without any undue suggestiveness. (See id.)

With regard to counsel's failure to object to testimony about a prior identification, the trial court found that the claim was not cognizable under C.P.L. § 440.10(2) because that argument was already rejected on the merits by the Appellate Division. (See id.) Alternatively, the trial court also found the claim to be without merit because counsel's failure to object was a legitimate and reasonable strategy. (See id.)

The trial court also rejected Petitioner's other claims.

Petitioner sought leave to appeal the denial of his 440

_____

Decl., Ex. J.)

motion to the Appellate Division, First Department (see Litsky Decl., Ex. K), which was denied on July 21, 2006, because there was "no question of law or fact presented which ought to be reviewed." (Litsky Decl., Ex. M.)

## DISCUSSION

Petitioner asserts claims of ineffective assistance of counsel and a deprivation of due process arising out of the prosecutor's summation remarks. Respondent concedes that the Petition is timely and that Petitioner exhausted his state remedies. Respondent argues that the ineffective assistance of counsel claims raised in the Petition are meritless and, in any event, were not prejudicial. As for the claim of prosecutorial misconduct during summation, Respondent argues that it is procedurally barred and also without merit.

## I. AEDPA Standard of Review

Under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), a federal court may grant habeas relief to a state prisoner only if the state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1) (2008), or if it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," id. § 2254(d)(2).

20

A state court decision is "contrary to" clearly established federal law if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 413, 120 S. Ct. 1495, 1523 (2000); accord Leslie v. Artuz, 230 F.3d 25, 32 (2d Cir. 2000); Clark v. Stinson, 214 F.3d 315, 320 (2d Cir. 2000). The phrase "clearly established Federal law, as determined by the Supreme Court of the United States" limits the law governing a habeas petitioner's claims to the holdings (not dicta) of the Supreme Court existing at the time of the relevant state-court decision. See Williams, 529 U.S. at 412, 120 S. Ct. at 1523; Leslie, 230 F.3d at 32.

"The 'unreasonable application' standard is independent of the 'contrary to' standard," and "means more than simply an 'erroneous' or 'incorrect' application" of federal law. Henry v. Poole, 409 F.3d 48, 68 (2d Cir. 2005) (citing Williams, 529 U.S. at 411, 120 S. Ct. at 1522). A state court decision is based on an "unreasonable application" of Supreme Court precedent if it correctly identifies the governing legal rule, but applies it in an unreasonable manner to the facts of a particular case. See Williams, 529 U.S. at 413, 120 S. Ct. at 1523. The Second Circuit has noted that "Williams also made clear that a federal habeas

21

court may permissibly conclude that federal law has been unreasonably applied by the state court even though not all reasonable jurists would agree that the state court's application was unreasonable." Henry, 409 F.3d at 68. Thus, a court should inquire as to whether the state court's application of federal law was "objectively unreasonable," falling "somewhere between merely erroneous and unreasonable to all jurists." Id. (internal quotations omitted).

Further, under AEDPA, "a determination of a factual issue made by a State court shall be presumed to be correct. The [petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1) (2008). "This presumption of correctness is particularly important when reviewing the trial court's assessment of witness credibility." Parsad v. Greiner, 337 F.3d 175, 181 (2d Cir. 2003). A state court's decision adjudicated on the merits and based on a factual determination "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 1041 (2003).

I.  Petitioner Has Not Established Ineffective Assistance of Counsel Under the Standard Required by AEDPA

Petitioner claims ineffective assistance of counsel on three grounds: (1) counsel failed to object when the prosecutor introduced testimony about a prior lineup identification of

22

Petitioner by a witness who could not identify Petitioner in court; (2) counsel failed to object to the prosecution's application to withdraw notice of its intent to offer evidence of a statement that Petitioner made in connection with his August 28, 2001 arrest; and 3) counsel failed to inquire as to why a photograph was allegedly taken of Petitioner before the September 6, 2001 lineup.

A.    Legal Standard

For the purpose of AEDPA, ineffective assistance of counsel claims are "squarely governed by the Supreme Court's holding in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984)." Williams, 529 U.S. at 390, 120 S. Ct. at 1511; accord Eze v. Senkowski, 321 F.3d 110, 124 (2d Cir. 2003). A petitioner must satisfy a two-part test in order to establish that his Sixth Amendment right to effective assistance of counsel has been violated. See Strickland, 466 U.S. at 687, 104 S. Ct. at 2064-65; Henry, 409 F.3d at 62-63; Lanfranco v. Murray, 313 F.3d 112, 118 (2d Cir. 2002). A petitioner must show (1) that counsel's representation fell below an objective standard of reasonableness, and (2) that the deficient performance of counsel prejudiced the defense. See Henry, 409 F.3d at 63 (quoting Strickland, 466 U.S. at 687-88, 104 S. Ct. at 2052). Finally, in the habeas context, a petitioner must also show that "the [state court] applied Strickland to the facts of his case in an objectively unreasonable

23

manner." Cox v. Donnelly, 387 F.3d 193, 197 (2d Cir. 2004) (internal quotation marks omitted) (quoting Bell v. Cone, 535 U.S. 685, 698-99, 122 S. Ct. 1843, 1852 (2002)).

In applying the first prong of the Strickland test, determining the quality of representation, a court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Strickland, 466 U.S. at 689, 104 S. Ct. at 2065 (citation and internal quotation marks omitted); see also United States v. Best, 219 F.3d 192, 201 (2d Cir. 2001) ("Actions or omissions by counsel that might be considered sound trial strategy do not constitute ineffective assistance.") (internal quotation marks and citations omitted). A strategic decision is a "conscious, reasonably informed decision made by an attorney with an eye to benefitting his client." Cox, 387 F.3d at 198; accord Pavel v. Hollins, 261 F.3d 210, 218 (2d Cir. 2001). A court "must 'make every effort . . . to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" Henry, 409 F.3d at 63 (quoting Strickland, 466 U.S. at 689, 104 S. Ct. at 2065); see also Cox, 387 F.3d at 198; United States v. DiTommaso, 817 F.2d 201, 215 (2d

24

Cir. 1987). "The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight." Yarborough v. Gentry, 540 U.S. 1, 8, 124 S. Ct. 1, 6 (2003) (per curiam).

Under the prejudice prong of the Strickland test, a habeas petitioner must demonstrate that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694, 104 S. Ct. at 2068.

To prevail under Strickland, a petitioner must meet the standards of both prongs of the test. However, "there is no reason for a court deciding an ineffective assistance claim to . . . address both components of the inquiry if the defendant makes an insufficient showing on one." Strickland, 466 U.S. at 697, 104 S. Ct. at 2069.

## B. No Showing of Objectively Unreasonable Performance or Prejudice

For the reasons discussed below, the Court concludes that Petitioner's counsel was not ineffective under the Strickland standard, and, thus, the state courts did not unreasonably apply the Strickland standard in denying Petitioner's claims.

### 1. Testimony of an Eyewitness as to a Prior Identification

Petitioner claims that counsel was ineffective for failing to object to the prosecutor's introduction of Csantos's testimony

about his prior identification of Petitioner at the September 6, 2001 lineup. Petitioner asserts that the introduction of testimony regarding the lineup identification violated C.P.L. §§ 60.30 and 60.25.

C.P.L. § 60.30 permits a witness to testify about a prior identification of a defendant, if the witness identifies the defendant as the perpetrator in the courtroom. See C.P.L. § 60.30 (McKinney 2005). If a witness is unable to make a courtroom identification, then C.P.L. § 60.25 provides that a witness may testify about a prior identification of the perpetrator if the witness testifies that "[h]e is unable at the proceeding to state, on the basis of present recollection, whether or not the defendant is the person in question." C.P.L. § 60.25 1(a)(iii).

Although there is a murky line between being unable to identify a perpetrator in the courtroom on the basis of failed recollection, as opposed to other circumstances, including simple lack of recognition, the Court will assume for purposes of this proceeding that an objection could have been lodged under § 60.25 to permitting Csantos and others to testify about his pretrial lineup identification of Petitioner. Csantos testified at trial that if he saw the perpetrator he would recognize him, yet, when asked, "Do you see that person in the courtroom today?" Csantos replied, "No, I don't see him." (T. at 241.) Csantos did not testify to a lack of recollection, and neither the prosecutor nor

26

the court sought to clarify why Csantos was unable to identify the perpetrator. See People v. Quevas, 81 N.Y.2d 41, 45-46, 595 N.Y.S.2d 721, 723 (1993) (holding that it was error to permit testimony about pretrial identification where victim simply stated that he did not see the perpetrator in the courtroom, without any explanation of the reason why he could not make an in-court identification). Thus, under Quevas, admission of the pretrial identification testimony could have been objected to by defense counsel, as a violation of C.P.L. § 60.25. See Quinones v. Miller, No. 01 Civ. 10752 (WHP)(AJP), 2003 WL 21276429, at *45-46 (S.D.N.Y. June 3, 2003) (concluding that the state did not lay a proper foundation for prior identification testimony under C.P.L. § 60.25, but that the absence of an objection by defense counsel may have been strategic), Report & Recommendation adopted at 2005 WL 730171 (S.D.N.Y. Mar. 31, 2005), aff'd, 224 Fed. Appx. 44 (2d Cir. Mar. 22, 2007) (unreported decision).

Nevertheless, there are a number of reasons why defense counsel's failure to object did not constitute ineffective assistance of counsel. As an initial matter, in addressing Petitioner's 440 motion, the trial court concluded that Csantos's inability to identify Petitioner was understandable, "in light of [Petitioner's] vastly changed appearance since the time of the lineup." (Litsky Decl., Ex. J at 4.) In addition, the court noted that if defense counsel had objected to the lineup identification,

27

which was already before the jury, it would have given the prosecution an opportunity to "solidify its foundation" for the lineup identification evidence, and deprived defense counsel of the opportunity, during summation, to exploit Csantos's failure to identify Petitioner in the courtroom. (Id.) The Appellate Division found that: "[D]efendant has not shown the absence of strategic or other legitimate explanations for counsel's conduct. The record warrants the conclusion that such an objection would have been futile because the People would have established the admissibility of the lineup identification." Reyes, 11 A.D.3d at 294, 782 N.Y.S.2d at 457-58.

The state courts' conclusions are well-supported by the record, since an objection would likely have led to the prosecutor's eliciting from Csantos that he was unable to identify the perpetrator in the courtroom because more than a year had passed since the burglary, and Petitioner's appearance had been altered during that time. At the time of the crime, Petitioner had a hat on his head and some facial hair (see T. at 226); at the lineup, he had no hair on his head and was clean-shaven (see id. at 201-02); and, at trial, Petitioner had hair on his head and a full beard and mustache (see id. at 201-02, 226, 230, 234-35). Under these circumstances there is a strong likelihood that a clarification of Csantos's testimony, in response to an objection, would have resulted in the admission of the pretrial

identification. See Quinones, 2003 WL 21276429, at *47 ("Had [defense counsel] objected on C.P.L. § 60.25 grounds to the admission of testimony regarding the lineup, the State almost certainly would have elicited from [the witness] that her inability to recognize Quinones at trial was due to lapse of time."); Quinones, 224 Fed. Appx. 44, at *5 ("[S]ome New York appellate courts have held that even where the cause of a witness's inability to make a trial identification is unexplained or the testimony which bears upon the issue is vague, nonparticularized, and conclusory in content, the admission of third-person testimony concerning a pretrial identification is not error if the trial court could have inferred, based on the record as a whole, that the witness's inability was due to the lapse of time or change in appearance of the defendant since the prior identification . . . .") (internal quotation marks omitted).

Thus, the failure to object is likely to have been futile, and was not prejudicial, because it would not have affected the admission of the evidence or outcome of the trial. See United States v. Weisser, 417 F.3d 336, 346 (2d Cir. 2005)("Counsel's failure to object was not error because any objection would have been futile.").

In addition, as the state courts concluded, defense counsel's failure to object to the admission of the lineup identification may well have been strategic. Had counsel objected, it is likely

29

that the trial court would have allowed the prosecutor to further question Csantos about why he was unable to identify the perpetrator in the courtroom. This not only would have been likely to lead to laying the proper foundation for admission of the lineup identification; it would have given the prosecutor the opportunity to make a stronger record. With the record left as it was, defense counsel was able to argue in summation that Csantos was unable to identify Petitioner as the perpetrator, without having to address an explanation for the failure. This was critical to the misidentification defense advanced by defense counsel.

Finally, even if defense counsel had objected to the admission of Csantos's lineup identification and succeeded in precluding its admission in evidence, there is no reasonable probability that Petitioner would have been acquitted. Even without Csantos's identification, there was strong evidence against Petitioner, including Boscarino's unequivocal identification of Petitioner at the lineup and in the courtroom. Boscarino had ample opportunity to see Petitioner's face during and after the burglary, which took place over a ten-minute period in morning daylight.

Because defense counsel's conduct served a legitimate strategic purpose and did not result in prejudice, Petitioner's ineffective assistance claim on this ground should be dismissed.

## 2. Failure to Object to the Prosecution's Application to Withdraw a Notice of Intent

Petitioner contends that defense counsel was ineffective in failing to object to the prosecution's application to withdraw a notice of intent to introduce a statement Petitioner made to Caccamo in connection with his arrest on August 28, 2001. Specifically, at his arrest for allegedly committing a burglary at 219 East 89th Street, Petitioner told Caccamo that he did not live in the building, that he was there to do carpentry work for a friend named Jose, and that he went into apartment 4W. (See Litsky Decl., Ex. O ¶ B1.)

Counsel was not ineffective because there would have been no purpose to his objecting and Petitioner suffered no prejudice as a result of defense counsel's failure to object.

As an initial matter, the prosecution is not obligated to offer any evidence, even if it has previously stated an intention to do so. Thus, as noted by Justice Obus in his 440 motion decision, any objection to the prosecution's application to withdraw would have been pointless. (See Litsky Decl., Ex. J at 3.) In any event, Petitioner was not prejudiced because the statements in question were eventually elicited by Petitioner's counsel while cross-examining Caccamo. (See T. at 167-68.) Petitioner's counsel succeeded in getting the statement before the jury — and utilized it during summation — without having to call Petitioner to testify. (See T. at 259.) Finally, Petitioner was

31

ultimately acquitted of the August 28, 2001 burglary. Thus, there can be no claim that the outcome of the trial would have been more favorable to Petitioner had defense counsel lodged an objection.

For all of the foregoing reasons, the Court finds Petitioner's claim that counsel was ineffective for failing to object to the prosecution's withdrawal notice, to be meritless.

### 3. Failure to Object to the Photograph Allegedly Taken Before the Lineup

Petitioner claims that defense counsel was ineffective for failing to inquire as to why a photograph was allegedly taken of him before the lineup. In his 440 motion, Petitioner stated that "[a] few minutes prior to lineup Det. DiDomenico came to the holding cell and instructed [Petitioner] to stand against the wall and took a picture." (See Litsky Decl., Ex. G.) The 440 motion also claimed that counsel was ineffective for failing to subpoena the two eyewitnesses in order to question them about whether they viewed a picture of Petitioner before the lineup. In ruling on the motion, the trial court appeared to assume that the photograph existed (see Litsky Decl., Ex. J at 3), although there was no reference to it at the trial. However, the court concluded that defense counsel was not ineffective because there was no reason to inquire whether the eyewitnesses were shown a photo of Petitioner before they made their identifications. At the pre-trial suppression hearing, DiDomenico testified that Boscarino was shown a photo array (found to be fair), from which she selected an

32

earlier arrest photo of Petitioner. (See S. at 51.) Thereafter, both eyewitnesses credibly testified at the trial that they immediately identified Petitioner at the lineup, based on their opportunity to view the perpetrator of the burglary at the time of the incident. (See id.) The state court did not unreasonably apply Strickland.

Whether or not defense counsel acted reasonably in this regard, Petitioner has failed to establish that he was prejudiced by defense counsel's conduct. Assuming Petitioner's allegation about the pre-lineup photograph is true, there is no evidence that the two eyewitnesses viewed a picture before the lineup, other than Boscarino's viewing a photo array. Neither the testimony of DiDomenico, the detective, nor the testimony of the two eyewitnesses, even hints at any impropriety or suggestiveness prior to the lineup. In fact, the prosecutor explicitly asked both Boscarino and Csantos to describe the process involved in their viewing the lineup, and, in reply, neither made any mention of viewing a photograph of Petitioner. (See T. at 228, 239.)

Both eyewitnesses testified that they had a good view of the perpetrator on August 13, 2001; both testified that they were certain they made a correct identification at the lineup; and both testified that they identified Petitioner at the lineup immediately and without hesitation.

Therefore, Petitioner's claim that counsel was ineffective

33

for failing to inquire about the alleged photograph should be rejected.

## 4. Cumulative Performance of Counsel

From a broad perspective, review of the trial record further supports the conclusion that counsel vigorously and effectively represented Petitioner throughout the trial. See United States v. Cronic, 466 U.S. 648, 656, 104 S. Ct. 2039, 2045 (1984)("When a true adversarial criminal trial has been conducted — even if defense counsel may have made demonstrable errors — the kind of [adversarial] testing envisioned by the Sixth Amendment has occurred."). In denying Petitioner's CPL § 440.10 motion, Justice Obus, who presided over Petitioner's trial, wrote:

> In sum, the record reveals that trial counsel vigorously represented the defendant throughout the proceedings for which he was well-prepared. His legal arguments were apt, he ably cross-examined the People's witnesses and he advanced a cogent argument in summation, using the record to appropriately stress the defendant's primary theme of misidentification. Notably, he secured the suppression of highly incriminating evidence [in connection with the charge he was eventually acquitted on] as well as the defendant's acquittal on one of the two burglary charges that went to the jury.

(Litsky Decl., Ex. J at 5.) Having reviewed the transcript of Petitioner's trial, there is no basis to conclude that the 440 court's assessment was an unreasonable application of the Strickland standard.

Accordingly, the Court recommends Petitioner's ineffective assistance claim be dismissed in its entirety.

## III. Petitioner's Prosecutorial Misconduct Claim is Procedurally Barred

In her summation, the prosecutor advanced an argument about Petitioner's changing appearance, both to explain why Csantos was not able to identify Petitioner at trial, and to suggest that Petitioner was conscious of his own guilt. Using photographs introduced in evidence, the prosecutor pointed out the following with respect to Petitioner's appearance: at the time of his arrest, Petitioner had a goatee; at the time of the lineup, Petitioner had shaven off his goatee and no hair on his head; and, at the time of trial, Petitioner had grown a full beard and had a full head of hair. (See T. at 272-75, 280.) The prosecutor argued that the witnesses immediately identified Petitioner in the lineup and, that by altering his appearance, Petitioner hoped that there would be no identification. (See id. at 279.)

Petitioner contends that the prosecutor's summation argument — that he intentionally altered his appearance with the hope that the eyewitnesses would not be able to identify him — deprived him of his due process right to a fair trial. The Appellate Division held, however, that Petitioner's claim was "unpreserved," and declined to review it in the interest of justice. It went on to further hold, however, that "were we to review [this] claim, we would reject [it]." People v. Reyes, 11 A.D.3d at 293, 782

N.Y.S.2d at 458.

Thus, Respondent argues that the claim is procedurally barred and, in any event, is meritless.

A. Adequate and Independent State Procedural Grounds

Before a federal habeas court can reach the merits of a claim, it must determine whether review of the federal question raised in the petition is barred on the basis of an adequate and independent state ground. See Coleman v. Thompson, 501 U.S. 722, 750, 111 S. Ct. 2546, 2553 (1991); Richardson v. Greene, 497 F.3d 212 (2d Cir. 2007).

If a state court judgment is based on a state procedural rule that is "independent of the federal question and adequate to support the judgment," federal courts generally cannot review the state court judgment in a habeas corpus proceeding "unless the prisoner can demonstrate cause for the default [of the state rule] and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman, 501 U.S. at 750, 111 S. Ct. at 2553; see also Lee v. Kemna, 534 U.S. 362, 375, 122 S. Ct. 877, 885 (2002); Green v. Travis, 414 F.3d 288, 294 (2d Cir. 2005); Rodriguez v. Smith, 485 F. Supp. 2d 368, 380 (S.D.N.Y. 2007).

A state appellate court decision holding that an issue raised on appeal was not adequately preserved at trial may potentially

bar federal habeas review. See Green, 414 F.3d at 294 (addressing the argument that a petitioner's claim was procedurally barred because he failed to preserve an issue for appeal, but concluding that the grounds for rejecting petitioner's claim were not independent of federal law); see also Rodriguez, 485 F. Supp. 2d at 380 (finding petitioner's prosecutorial misconduct claims to be procedurally barred). Furthermore, even if the state court has also ruled, in the alternative, on the merits of the claim raised in the federal habeas action, federal habeas review is foreclosed when the court has nonetheless expressly relied on a procedural default as an independent and adequate state ground for denying relief. See Green, 414 F.3d at 294; Glenn v. Bartlett, 98 F.3d 721, 724 (2d Cir. 1996). "Thus, even when a state court says that a claim is 'not preserved for appellate review' but then rules 'in any event' on the merits, such a claim is procedurally defaulted." Green, 414 F.3d at 294 (quoting Glenn, 98 F.3d at 724-25).

The Court must therefore determine whether Petitioner's prosecutorial misconduct claim is barred by an independent and adequate state procedural rule.

## 1. Independent State Procedural Bar

Under New York law, in order to preserve an issue for appeal, a contemporaneous, specific objection must be lodged at trial, and if the objection is not sustained, the objecting party must seek further relief, such as a mistrial. See C.P.L. § 470.05(2); see

also Garvey v. Duncan, 485 F.3d 709, 714 (2d Cir. 2007)("[A] defendant must make his or her position known to the court. The purpose of this rule is to apprise the trial judge and the prosecutor of the nature and scope of the matter defendant contests, so that it may be dealt with at that time. A general objection is not sufficient to preserve an issue.") (internal citations omitted); Jodhan v. Ercole, No. 07 Civ. 9263 (RMB)(JCF), 2008 WL 819311, at *5 (S.D.N.Y. Mar. 28, 2008)("Under New York law, in order to preserve a claim of prosecutorial misconduct for appellate review, defense counsel is required to make a specific objection at trial, and, if his objections are sustained, to seek further relief.")(Report and Recommendation adopted by Jodhan v. Ercole, No. 07 Civ. 9263 (RMB)(JCF), 2008 WL 2477457 (S.D.N.Y. June 16, 2008)); People v. Medina, 53 N.Y.2d 951, 953, 441 N.Y.S.2d 442, 443 (1981) (holding that a claim regarding a prosecutor's remarks on summation was unpreserved where the trial court sustained defendant's objection and defendant "did not request any curative instruction or move for a mistrial on [that] basis."); People v. Rogers, 281 A.D.2d 240, 241, 721 N.Y.S.2d 533, 533 (1st Dep't 2001) ("By failing to object, by making general objections, or by failing to request any further relief after objections were sustained, defendant failed to preserve her contentions.").

The Appellate Division did not elaborate as to why

38

Petitioner's claim was unpreserved, but since the record shows that counsel clearly said "objection" directly after the challenged statements, and the court replied "overruled," the Appellate Division's holding necessarily implies that it found Petitioner's objection was too general, did not alert the court to Petitioner's specific position, and was not answered with a specific ruling — all of which are fully supported by the record. (See T. at 279.) Thus, the Appellate Division clearly denied Petitioner's claim on an independent state procedural ground.

### 2. Adequate State Procedural Bar

The adequacy of state procedural bars to the assertion of federal questions is itself a federal question not for the states to conclusively decide. See Lee, 534 U.S. at 375, 122 S. Ct. at 885 (citing Douglas v. Alabama, 380 U.S. 415, 422, 85 S. Ct. 1074 (1965)). As a matter of federal law, "[a] claimed procedural bar is adequate only if state courts have applied the rule 'evenhandedly to all similar claims.'" Monroe v. Kuhlman, 433 F.3d 236, 241 (2d Cir. 2006) (quoting Cotto v. Herbert, 331 F.3d 217, 239 (2d Cir. 2003)). However, "even though a rule generally might be considered firmly established and regularly followed, considered in the specific circumstances of a case, it still might be inadequate to preclude federal review, if its application would be 'exorbitant,' that is to say, an arid 'ritual . . . [that] would further no perceivable state interest.'" Richardson, 497

39

F.3d at 218 (quoting Lee, 534 U.S. at 366, 122 S. Ct. at 880).

Further, when engaging in an adequacy analysis, federal courts should give deference to state court decisions and determine if there is a "fair or substantial basis" for the application of the state law to the particular case. Garcia v. Lewis, 188 F.3d 71, 78 (2d Cir. 1999). "[T]he question is whether application of the procedural rule is 'firmly established and regularly followed' in the specific circumstances presented in the case, an inquiry that includes an evaluation of the asserted state interest in applying the procedural rule in such circumstances." Cotto, 331 F.3d at 240 (citing Lee, 534 U.S. at 386-87, 122 S. Ct. at 877) (emphasis added).

In the Garvey case, the Second Circuit examined the guidelines a habeas court should use to determine the adequacy of a claimed state procedural bar: "(1) whether the alleged procedural violation was actually relied on in the trial court, and whether perfect compliance with the state rule would have changed the trial court's decision; (2) whether state case law indicated that compliance with the rule was demanded in the specific circumstances presented; and (3) whether petitioner had 'substantially complied' with the rule given 'the realities of trial,' and, therefore, whether demanding perfect compliance with the rule would serve a legitimate governmental interest." Garvey, 485 F.3d at 714 (citing Cotto, 331 F.3d at 240). While the

40

factors "are not a test for determining adequacy, they are nonetheless used as guides in evaluating 'the state interest in a procedural rule against the circumstances of a particular case.'" Id. at 714 (quoting Lee, 534 U.S. at 386-87, 122 S. Ct. at 891.)

Garvey examined whether a claimed error in the admission of an identification of the defendant at trial was preserved under C.P.L. § 470.05(2). See id. at 714-15. Specifically, the court conducted an in-depth review of New York's preservation doctrine and observed: "[In New York, a] general objection is not sufficient to preserve an issue since such would not alert the court to defendant's position. . . . Instead New York's highest courts uniformly instruct that to preserve a particular issue for appeal, defendant[s] must specifically focus on the alleged error." Id. (citing People v. Gray, 86 N.Y.2d 10, 19-20, 629 N.Y.S.2d 173, 175(1995)). Garvey also noted, however, that even if there is only a general objection, when a trial court nonetheless expressly decides an issue, that also preserves the issue for appeal. See Garvey, 485 F.3d at 717; see also People v. Turriago, 90 N.Y.2d 77, 83-84, 659 N.Y.S.2d 183 (1997) (holding that an issue was not preserved for appeal when a lower court's observations about a related issue did not amount to an express decision on the issue in question). Thus, under New York law, if a defendant specifically raises an issue at trial, or if, absent a specific objection, the trial court nonetheless expressly

41

decides the specific issue in response to a general objection, the issue is preserved for appeal. <u>See</u> C.P.L. § 470.05(2); <u>Gray</u>, 86 N.Y.2d at 19-21, 629 N.Y.S.2d 175-76; <u>People v. Nieves</u> 90 N.Y.2d 426, 431 n.\*, 660 N.Y.S.2d 858, 861 n.\* (1997) (holding issue was preserved despite general objection because the trial court specifically ruled on the issue); <u>see also</u> <u>Garvey</u>, 485 F.3d at 717; <u>Garcia</u>, 188 F.3d at 79 (citing the <u>Nieves</u> footnote).

Applying the three <u>Garvey</u> factors, there can be no doubt as to the adequacy of the state procedural bar relied upon by the Appellate Division. First, assessing the state court's reliance on Petitioner's procedural violation — failing to specifically object contemporaneously — is not helpful in the context of C.P.L. § 470.05(2). As the court in <u>Cotto</u> observed, "the lack of a . . . [specific] objection would not, almost by definition, be mentioned by the trial court." 331 F.3d at 242. Thus, the trial court's silence about the absence of a specific objection does not imply a lack of reliance on that omission. <u>See</u> <u>id</u>. Similarly, the other aspect of the first factor, whether perfect compliance would have changed the outcome, "is less relevant" in evaluating the failure to preserve a claim "because 'the likely impact of a contemporaneous objection involves a certain degree of speculation.'" <u>Ashley v. Burge</u>, No. 05 Civ. 4497 (JGK), 2006 WL 3327589, at \*5 (S.D.N.Y. Nov. 3, 2006) (quoting <u>Cotto</u>, 331 F.3d at 243). On the one hand, defense counsel's general objection

informed the trial court that Petitioner opposed the prosecutor's argument about his appearance. Apprised of that general stance, the trial court may not have been receptive to any repeated objections, even if they were more specific. On the other hand, the record does not indicate that Petitioner's counsel ever expressly argued that the prosecutor strayed beyond fair comment on the evidence and violated Petitioner's due process rights. Thus, there is an equal or greater probability that a specific and contemporaneous objection would have served the purpose of § 470.05(2): "to give the trial court a clear opportunity to correct any error." See id. at 243. "[T]hrough argument" following a specific objection, the trial court "may well have come to a different conclusion." Id. (positing that a carefully argued contemporaneous objection might have been successful). In short, it is not clear that perfect compliance would have been futile.

Second, state caselaw clearly indicates that defendants must comply with the rule in the context of challenges to a prosecutor's summation. See, e.g., People v. Williams, 38 A.D.3d 925, 926, 833 N.Y.S.2d 160, 161-62 (2d Dep't 2007) ("The failure to raise an objection to the remarks made by the prosecutor on summation renders the defendant's claim that he was denied his right to a fair trial unpreserved for appellate review."); People v. Benson, 38 A.D.3d 563, 831 N.Y.S.2d 266, 267 (2d Dep't 2007) (finding that a claim regarding prosecutor's summation was

unpreserved for appellate review because defendant either failed to object, or raised only general objections); see also Charlemagne v. Goord, No. 05 Civ. 9890 (DAB)(HBP), 2008 WL 2971768, at *6 (S.D.N.Y. June 30, 2008) (Report & Recommendation) ("To preserve for appellate review a challenge to a prosecutor's comments during summation, this rule requires a defendant to timely object to such comments and, when those objections are not sustained, seek a curative instruction or move for a mistrial."); Dunn v. Sears, No. 06 Civ. 4757 (VM), 2008 WL 2485431, at *9-10 (S.D.N.Y. June 18, 2008) (same).

As for the third factor, Petitioner cannot have been said to have substantially complied with the rule's requirements, given the realities of trial, because of his failure to specifically object.

Accordingly, the Court concludes that Petitioner's prosecutorial summation claim is barred from review by an independent and adequate state procedural rule.

B.   No Showing of Cause and Prejudice or Miscarriage of Justice

Petitioner has not argued "cause" for his procedural default; therefore, the Court need not consider the issue of prejudice. Nor has he argued or demonstrated that a miscarriage of justice would occur if the claim is not heard. A miscarriage of justice occurs "in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually

44

innocent." Murray v. Carrier, 477 U.S. 478, 496, 106 S. Ct. 2639, 2649 (1986); accord Washington v. James, 996 F. 2d 1442, 1447 (2d Cir. 1993).

"Actual innocence means factual innocence, not mere legal insufficiency." Dunham v. Travis, 313 F.3d 724, 730 (2d Cir. 2002) (quoting Bousley v. United States, 523 U.S. 614, 623, 118 S. Ct. 1604, 1611 (1998)) (internal quotation marks omitted). Additionally, "to be credible, such a claim requires [a] petitioner to support his allegations of constitutional error with new reliable evidence . . . ." Schlup v. Delo, 513 U.S. 298, 324, 115 S. Ct. 851, 865 (1995). The doctrine of actual innocence applies only in "extraordinary case[s]" and "credible claims of actual innocence are extremely rare." Doe v. Menefee, 391 F.3d 147, 160-61 (2d Cir. 2004) (quoting Carrier, 477 U.S. at 496, 106 S. Ct. at 2639, and Schlup, 513 U.S. at 321, 115 S. Ct. at 864).

Because Petitioner has not presented any new reliable evidence of his innocence, he has not satisfied the miscarriage of justice standard. Moreover, the totality of the evidence unquestionably forecloses any claim of actual innocence. The record contains extremely strong evidence of Petitioner's guilt, including the lineup identification by two eyewitnesses, and the in-court identification by one of the witnesses. Therefore, Petitioner's prosecutorial misconduct claim is procedurally barred from this Court's habeas review.

Thus, the Court recommends that Petitioner's prosecutorial misconduct claim be dismissed.

## CONCLUSION

For the reasons set forth above, this Court respectfully recommends that Petitioner's request for habeas relief be denied and that this action be dismissed with prejudice. Further, because Petitioner has not made a substantial showing of the denial of a constitutional right, the Court recommends that no certificate of appealability be issued. See 28 U.S.C. § 2253(c)(2); Lucidore v. N.Y. State Div. of Parole, 209 F.3d 107, 112 (2d Cir. 2000). The Court further recommends that the Court certify, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from its order would not be taken in good faith. See Coppedge v. United States, 369 U.S. 438, 444-45, 82 S. Ct. 917, 920-21 (1962).

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. See also Fed. R. Civ. P. 6(a) and (d) (2008). Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable P. Kevin Castel, United States District Judge, and to the chambers of the undersigned, Room 1660. Any requests for an extension of time for filing objections must be directed to Judge Castel. Failure to file objections will result in a waiver of those objections for purposes of appeal. See

46

Thomas v. Arn, 474 U.S. 140, 145, 155, 106 S. Ct. 466, 470, 475 (1985); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir. 1992); Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989).

Respectfully submitted,

THEODORE H. KATZ
UNITED STATES MAGISTRATE JUDGE

Dated: August 26, 2008
       New York, New York

Copies mailed to:

Teofilo Reyes
02-A-6617
Woodbourne Correctional Facility
99 Prison Road
P.O. Box 1000
Woodbourne, New York 12788

Ashlyn Dannelly, Esq.
Thomas B. Litsky, Esq.
Office of the Attorney General
120 Broadway
New York, New York 10271

47